Ladies and gentlemen, our first case for argument is the Exodus Refugee Immigration Service v. Pence. Mr. Fishman. Thank you, Your Honor. May it please the Court. Governor Pence's directive at issue in this case merely suspends resettlement grants respecting refugees coming from Syria, where U.S. officials admit that we have compromised intelligence, and it neither constitutes national origin discrimination nor exceeds the Governor's authority under the Refugee Act or other federal law. Governor Pence's directive is merely a response to conditions, and it is meant to be temporary. It is meant to in no way be a permanent action. It is meant to withdraw Indiana from participating in the resettlement process. It is not meant to be a barrier to the actual resettlement of Syrians in Indiana. It is meant merely to partially withdraw Indiana from participating in a federal grant program. The point here, of course, is to deter— Aren't all these people screened by the State Department? They do go through screening procedures, yes. So what, you don't trust them? Is that the point? Well, I think what we're relying on here, what the Governor's relying on, are the statements of the FBI Director and the Assistant Director for Counterterrorism before Congress, that we lack a footprint in Syria, that we lack information. It's not a—in fact, Assistant Director Steinbach— Well, why doesn't that affect the screening? I think the information, the lack of information that Assistant Director Steinbach is talking about— I mean, doesn't the State Department take account of that when deciding whether to let someone in? Well, I'm sure they do. Let's bear in mind— Well, why? And you do it better, or what? No, the point is that there's an acknowledged lack of information. And this is something that's— Well, has this been discussed with the State Department? We have requested— Have they told you that they don't know what's going on? We have requested additional information, what we're relying on. Well, have they given it to you? They have sent us a particular spreadsheet document that is information about people actually coming to India. It's a very limited document. It just tells us demographic information, which is more than we were getting in the past. But it's not what—you know, it's not a statement that— So you think their screening is inadequate? I think that they've acknowledged that the FBI has acknowledged that there's a lack of information. It's not a lack of process. It's a lack of information. I'm talking about the State Department. I know. And I'm talking—Governor Pence is not relying on the State Department. He's relying on the statements of the FBI director, the counterterrorism director, and— Yeah, he doesn't listen to the State Department. Well, he's listening to the FBI director. Well, look, the State Department screens refugees. And the FBI is— No, the FBI does not screen refugees. The State Department screens refugees. It may ask for help from other services, other agencies, but it is the screening—it is the government agency responsible for screening all visa applicants. Let's remember what Director Comey said during his testimony, which is you can query the databases until the counsel— I don't understand what difference it makes what the head of the FBI said. We have an amicus brief in this case filed by the United States, and the United States thinks that Indiana has exceeded its authority. That seems to me the thing from the United States that we should be listening to. Well, I think the United States is speaking with respect to equal protection. I don't understand them to be talking about preemption. Now, if we're talking about equal protection, then it's a question of the national origin discrimination theory, which we think is not at play because what we're talking about here is a concern that happens to be—happens to have reference to geography  When a state makes an argument that's saying, we're differentiating according to whether somebody is from Syria, but that has nothing to do with national origin, all it produces is a broad smile. Well, it certainly, I think, goes back to the testimony before Congress that the governor is relying on. And let's bear in mind, this is a governor who has a wealth of information available. He's making judgments based on what he understands. Wait, the governor of Indiana knows more about the status of Syrian refugees than the U.S. State Department does. No, he's— And that's the ground for decision. No, what he's saying is that based on the testimony before Congress, it appears that we don't know enough about these refugees and we need to find out. Well, that sounds like a ground for disagreeing with the State Department. It sounds like a ground for asking the president to overrule the State Department. It doesn't sound like a ground for distinguishing, according to refugees, under a program that categorically forbids such distinctions. I think it is important to bear in mind the context, which is this federal grant program. If somehow we were doing something to actually stop people coming in the state, that would be one thing. But all we're doing here is partially essentially withdrawing from the program. The federal grant program is about resettlement grants under the Refugee Act. I take it Indiana does not want to withdraw from the program. Not entirely. It hasn't withdrawn from the program. That's correct. Then it looks like we have the same general proposition as we do under, say, the Medicaid Act. Indiana can choose to be in or out, but having chosen to be in, it has to be in all the way. And if it's out, it's out all the way. And it can't pick and choose. It can't be in but not for those parts we don't like. Well, courts, including the Supreme Court, have said that pretty often about Medicaid. I don't see why the Refugee Act is different. The one thing I would point the Court to is that the regulations implementing the Refugee Act do speak in terms of partial withdrawals. Now, I'm not entirely sure exactly what form that is supposed to take, but I think it does undercut the idea that it's all in or all out. Now, if the State Department, if PRM, if ORR, they think that we're Is there some language in the Refugee Act that you're relying on for the proposition that you could be out for a particular country of origin when the Refugee Act expressly forbids distinctions on the basis of country of origin? No, I'm only pointing to a general statement about partial withdrawal. No, is there some language in the statute? Any language in the statute that you're relying on? No. Okay. What we're relying on is what we think of as our right not to participate partially. Now, again, bear in mind. Look, you have a right not to participate in part if the statute gives you that right. That's why I said, what language in the statute are you relying on? And your answer is, as I understand it, none. Well, then you don't have such a right. If the statute gives it to you, fine. If it doesn't give it to you, fine. But we need to figure out what the statute does. Is the CFR site not sufficient? The Code of Federal Regulations, at last looking, is not part of the United States Code. If you're not relying on something in the statute, then you're not asserting a right under the statute. Okay. Well, I think we were thinking that within the operational understanding of the Refugee Act that would apply and would acknowledge that there are circumstances where a state cannot participate in part. So if we're not permitted to rely on that, I guess we'll have to go back and look at it. But that's the justification. That's the point. And we think, quite frankly, that really it ought to be up to a formal process within the administrative body. So you want Indiana to be safe and you want these people to go to other states? The theory here is that we are deterring the local resettlement agencies from bringing in Syrian refugees pending a better understanding of what's going on in Syria. Why should Indiana be safer than, say, Illinois? Well, I think it comes down to what each governor's Is there enough states to do this? Well, each. Then there are no more Syrian refugees. Well, no, no, not at all. Because bear in mind that since this has happened, two governors have withdrawn entirely from the program, which only underscores this is a grant program. If the states are not participating in the grant program, it just means the United States government will administer the program itself. And that's fine. That is the state's right to withdraw from the grant program. But Indiana hasn't done it. No, that's what led to my earlier question. It's like the Medicaid Act. You can choose to be in. You can choose to be out. But if you're in, you play by the government's rules. The government's rules, including the CFR site that says that there can be partial withdrawals. Now, interpreting what language in the statute? Nothing. At least so far as you're telling us, nothing. Maybe we can think about it a different way. If the state submitted an initial plan that said we'll take refugees from these countries but not from these countries, would that comply with the statute? Well, I think we'd have to sort that out with the Department of State. I'm not sure that it would. And I think to the extent that it wouldn't, then going through that administrative mechanism would be the proper way to sort it out. So this can't be conceptualized? This directive from the governor can't be conceptualized as an amendment to the preexisting plan? I think it can be. Now, I will say that we have not formally amended the plan. The preexisting plan was submitted before this directive. It was approved afterwards. Since then, of course, there's been an injunction. The new plan does not make mention of it. But I would think it likely that if the injunction were lifted, we would more formally integrate this into the plan, and then that would be sorted out. Right, but as things stand now, as the case comes to us, I'm trying to figure out the right way to think about this directive. I mean, it came in a press release from the governor. And apparently, during the course of litigation, has been amended by the state agency head to, I mean, as originally promulgated, and that's a loose use of that word because it's just a press release from the governor. But as originally issued, the directive, which is what everybody's calling it, says no Syrians. And pretty clearly, that means no Syrians, and that's national origin or nationality discrimination on its face. Then there was a walk back of that by the agency head. They said that's not what we mean. What we really mean is we won't take anybody who's fleeing Syria. Not that we won't take them, but that we won't reimburse grants for the local agencies that are resettling these refugees. So what formally is that? Is that an official policy? How should we think about it? Well, I think part of that, I think we think of it as a policy. I think we think of it as something that, if and when the time comes, would be integrated by way of the state plan. That would be the thing that makes the most sense. You're just trying to push Syrians into other states. I think what we're trying to do, in part, is to also initiate a better dialogue with the United States government so they understand the concerns of state and local authorities. It's a question, really, of can the governors… Are Syrians the only Muslims that Indiana fears? Well, this has nothing to do with religion. This has to do with what's going on in Syria. Oh, of course it does. Oh, I object to that, Your Honor. Look, if you look at the attacks, the terrorist attacks in the United States, 9-11, the attacks in New York, Boston, San Bernardino, they're all by Muslims. ISIS is Muslim. Al-Qaeda was Muslim, right? You understand that, don't you? I do. Do you understand that?  I said I did. Don't interrupt me, will you please? In the governor's directive, it doesn't go with religion. Don't interrupt me. Attempting to argue over a judge is not a productive method of argument. So is it your view that Syrians are the only potential terrorists in the United States? People from Syria are the ones where we lack the intelligence. That's what the FBI director and the assisting FBI director have said. So we have perfect intelligence about all other potential terrorists? Oh, of course not. ISIS and all those people? Of course not. What we have is a statement directed at Syria. Well, then why have you singled out Syrians? Because of what the FBI director and the assisting FBI director have said. They have said, in fact, Director Comey acknowledged that we have better intelligence about refugees coming from Iraq given that we have a footprint there, given that we've been there for many years. This was a very specific statement with respect to what's going on in Syria. That's why the governor became concerned about people coming from Syria. So in other words, we have enough information to prevent terrorist attacks by anybody who is not from Syria? Is that what you're saying? What I'm saying is... You know what the FBI says? We're perfectly secure against everyone except Syrians. No. That's preposterous, right? Yeah, but that's not what they said. Well, then why has Indiana focused on Syrians? Because of what the FBI director... If there are terrorist dangers from other foreigners who happen to be Muslim. Because of what the FBI director, the assistant director... Look, I asked you whether the FBI director had said the United States is perfectly secure against foreign terrorists unless they're from Syria. No, of course not. Of course not. So there are dangers. There are potential dangers from other foreigners. Now, why has Indiana limited its concern to Syrians? This is what elected officials... What about people from France or Germany where they've had terrorist attacks? I'm not sure how else to say it. This is what the governor has said in response to what has been said about Syria and what's going on on the ground in Syria. This is what governors are elected to do. They make judgments about these things. You're not answering my question. I apologize. I'm not sure what the question is, I guess. I thought it was perfectly clear. Why is it that Indiana focuses only on Syrians or people in Syria and doesn't regard any other foreigners as posing a potential terrorist threat? My response is that the governor is responding to statements by the director of the FBI, the assistant director for counterterrorism, about the lack of footprint and the lack of information about refugees coming out of Syria. And they have perfect footprints about all other refugee applicants. Of course not. Well, then what is special about the Syrians? That's what they talked about before Congress. But you just said that other foreigners pose terrorist threats. But Indiana is indifferent to any potential terrorists other than people from Syria. And the question is, does that make any sense? I think it does when the director of the FBI and the counterintelligence Oh, honestly. When they single out Syria You are so out of it. You don't think there are dangers of people from Libya, from Egypt, from Saudi Arabia, from Yemen, from Greece and France and Germany, which have had terrorist attacks? We don't have statements before Congress by the director of the FBI and the counterterrorism assistant director singling out those countries for lack of information and lack of footprint. Yeah, but you seem to think that only Syrians are a danger because somehow the FBI knows everything about potential terrorists in other countries. That's what you're suggesting. I don't think it's what I'm suggesting at all. Of course it is. You are differentiating between Syrians and other potential terrorists and saying that our government has enough information about all these other countries to prevent any of those people from coming to the United States. The FBI director, the assistant director, have not singled out those other countries for stating that we have lack of information about them. That's the difference. And it is the position of the governor of Indiana that the FBI director is higher in the hierarchy than the president of the United States, who thinks we do have enough information. No, I think what the governor is doing is trying to act within his own authority based on information. Yeah, well, then we come back to the question, where in the Refugee Act does the governor get authority to exclude people from one country when the Refugee Act specifically forbids that? Well, we've been down this road before. Yes, we have. Would you like me to try again? The state's position, as I understand it, is that the director of the FBI has higher authority over terrorism than the president of the United States, and the state doesn't have to follow the rules in the Refugee Act, which is pretty extraordinary on both counts. Well, I don't think it's a question of trying to say that the FBI director has higher authority. The president of the United States has determined that the United States knows enough to admit 10,000 Syrian refugees. That's the president's decision. It may be right, it may be wrong. I don't see how a governor can disagree with the president by saying, well, the FBI director may have given him contrary advice. It's only a question of scope of authority. Based on the same concerns, two governors withdrew completely. We know that that's permissible, notwithstanding that they may be crediting the FBI director's statements the way that our governor has done. The only question is whether our governor has that authority under the statute. All right, I'll reserve the remainder of my time. Thank you. Okay. Thank you, Mr. Fisher. Mr. Falk. Thank you. May it please the Court. It's understandable the state here is attempting to argue that this is not nationality discrimination because of the obvious equal protection and problems with violating the Refugee Act. This obviously is nationality discrimination. I must say I am totally flummoxed by arguments about the equal protection clause. The president of the United States himself decided to admit, say, 10,000 refugees from Syria rather than 5,000 or 15,000. That is national origin discrimination or distinction. It's built into this program. And the Supreme Court has said that the equal protection clause means the same thing for the president of the national government and the state government. So if the president can decide, based on national origin, how many refugees there are, why can't a state? Because I think the case law is quite clear that the nationality act and the equal protection clause do not apply to people overseas. Once these Syrians are here, then everything attaches. But obviously built into our immigration and refugee system is the ability of the president with the advice of Congress. It's just full of national origin distinction, which leads me to think we should be thinking about the statute. The statute says states can't do this, can't be in the program and do this. Yes, and we certainly have argued as an alternative ground to the statute itself. But we also think that this is an equal protection problem because in this context we're dealing with countries of origin. Syria, these are Syrians, and the discrimination is national origin, which is subject to strict scrutiny. But it also violates the Refugee Act, and frankly, either way, the district court is to be affirmed. I would note that the one argument the state comes back to as to its justification is comments made by someone less than the president about this, but I think those comments are taken out of context. I think the state is quoting a media report, and we've actually set out for the court at page 9 of our brief with a citation to the actual transcript where all three of the federal officials who testified before Congress, while certainly expressing the fact that Syria is a problem, also indicated they were committed to the process and they were, as Secretary of Homeland Security Johnson said, the policy we have, and I'm quoting, strikes a balance between what we know we can accomplish with the resources we have and not shutting our eyes and doors to what is really a horrible world situation and doing our part to try to alleviate it. Before we go any further with the justification argument, I'd like to focus on and try again to establish what is the criteria for this policy which has been evolving. And as it was originally issued, it was pretty clearly nationality discrimination or national origin discrimination. As it has evolved, it's become a little ambiguous what the criteria is. It's my understanding that the agency had said we're not going to reimburse people for resettlement of people who are fleeing Syria and the way we'll determine or make that determination is by reference to their country of origin. That's correct. Information on the refugee application. That's correct. And is there a distinction in this immigration context between country of origin and nationality? Because nationality is the statutory term. That's correct. To my knowledge, there is nothing at all. What the state has said is we would like to target people who pass through Syria, but the only information we're getting from the federal government is this country of origin nationality. And the reason they're getting that is not that the federal government somehow is hiding information. It's that, as you note, the system is set up to deal with refugees, and refugees are by definition defined as people outside of their country of nationality or inside and facing persecution. You are national of the country to which you owe permanent allegiance. It is your home. So what the state is saying, people whose country of home is Syria we're going to discriminate against, that's national origin discrimination. But regardless of their country of birth, their nationality in the colloquial sense, right? Well, I think that's correct. I mean, I think if someone is born in Libya and when they're 5 days old moves to Syria and spends 50 years there, everyone would recognize that their country of origin or nationality is the same there. That's correct. They are Syrian. And that's the avowed purpose of the state's policy, to target Syrians, to try and discourage Syrians to refuse to pass through money that it has taken from the federal government for the benefit of Syrians and other refugees. Does immigration law construe country of origin to mean country of habitual residence or where the person was born? As near as I can tell, and we don't cite these cases, but from trying and looking at the cases, the courts tend to use country of origin and nationality the same. There are many cases which say, quote the Nationality Act, or the Refugee Act, but before getting to the word nationality, substitute country of origin, which makes perfect sense. It makes perfect sense to view someone who spent 45 years in Syria who is a recognized citizen, however that is established within Syria, of that country as Syrian. It would make no sense to have a refugee policy to treat that person as a refugee of France because they lived there for three days. Right, but the question for purposes of the statute is nationality. That's correct. Right, and we're looking for evidence of discrimination on the basis of nationality. That's correct. And again, the statute defines you are national of the country to which you pledge permanent allegiance. That is your home. And that is how the statutory term is defined? That's correct. Or construed? That is, I'm looking for the site, excuse me. Is that a regulatory matter? No, that is a statute. That is, I apologize, I was cited to the court, but it is 8 USC 1101A21. It's the definition section. Thank you. And that is actually right below or right near the definition of nationality. Okay, thank you. And so that's what Indiana is doing. Indiana is saying we have these Syrians, we don't want them in Indiana, we've identified them, this is their home, we are discriminating against them. Whether we call that a violation of legal protection because of nationality discrimination or whether we call that a violation of the Refugee Act because of nationality discrimination, we get to the same place. What Indiana is doing is clearly prohibited and the district court must be affirmed. Thank you. Mr. Fisher? Yes. I don't have much to add other than I think what we're concerned about, Your Honor, about the information is we're hoping to get more information. And we're hoping that the country of origin, which seemed like an easy way to make this decision, as the United States has pointed out, is too narrow. And fine, we're willing to take a look at other information about this. I would point out that our records show, and this is in the record, that in the past participants in the program who have received services that have been reimbursed and who were designated as coming from Syria actually had birthplaces in other countries, Lebanon and Jordan. And so I think that just evidences a disconnect between ethnicity and ancestry and what we're getting at here. If there are no further questions. Thank you. Okay. Well, thank you very much. Both sides.